1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JEFFERY S MARTIN,<br><br>    Plaintiff,<br><br>  v.<br><br>PIERCE COUNTY; NAPHCARE INC.;<br><br>MIGUEL BALDERRAMA; JANEL<br><br>FRENCH; IRINA HUGHES; PIERCE<br><br>COUNTY DOE EMPLOYEES 1-10;<br><br>NAPHCARE DOE EMPLOYEES 1-10,<br><br>    Defendant. | Case No. 3:20-cv-05709-TMC<br><br>ORDER GRANTING MOTIONS FOR<br>SUMMARY JUDGMENT |

Before the Court are Defendants' motions for summary judgment seeking dismissal of all claims asserted against them by Plaintiff Jeffery S. Martin. Dkt. 149, 152. For the following reasons, the motions are GRANTED. Martin's motion for partial summary judgment on Defendants' affirmative defenses (Dkt. 69) is DENIED as moot.

## I.   BACKGROUND

On January 26, 2017, Martin was arrested for driving under the influence. Dkt. 19 ¶ 20. On March 21, 2017, he pled guilty and was sentenced. *Id.* ¶ 22. He was incarcerated at the Pierce

County Detention and Corrections Center ("Pierce County Jail" or "PCDC") in Tacoma, Washington until June 7, 2018. *Id.* ¶ 53. He reported no medical issues during his initial health screening at the jail on January 26, 2017. Dkt 155-2 at 46.

At Pierce County Jail, Martin's health care was managed by the jail's medical director, Defendant Miguel Balderrama, M.D., and medical professionals employed by NaphCare (a private company contracted to provide medical care at the jail), including Defendants Irina Hughes, NP, and Janel French, LPN. *See* Dkt. 158 at 2; Dkt. 150 ¶¶ 1–2, 8–9. Dr. Balderrama was generally responsible for "provid[ing] patient evaluation and care when patients are referred by NaphCare nursing staff or employees for evaluation and treatment," *id.* ¶ 3, and referring patients for treatment by outside providers. *See id.* ¶¶ 6–7, 9.

On May 19, 2017, Martin submitted a request to PCDC to "speak with somebody about getting saline eyedrops twice a day." Dkt. 162-1 at 2. He stated that he had "chronic dry eye and severe allergies" and added that "regular eyedrops burn my eyes." *Id.* PCDC's record of the request indicates that a "sick call" was scheduled on May 21, 2017. *See id.* The next day, on May 22, a nurse made a chart entry that Martin was seen for the sick call and noted redness in his right eye. *See* Dkt. 155-2 at 35. On June 4, 2017, after being told that the jail could not provide him with melatonin but could send him a "handout on sleep," Martin responded: "Sure [I'll] try anything. [M]y eyes itch and burn so bad at lights out [it's] hard to stay asleep...[I'll] try anything to get more than 3 or 4 hours of sleep a night." Dkt. 155-1 at 9; Dkt. 162-1 at 3.

On June 6, 2017, Martin was seen by Nurse Darilyn Inglemon for a "kite" appointment. Dkt. 155-1 at 35. That same day, Nurse Inglemon made a chart entry stating that Martin's eyes were "red, watery and swollen," that the issues had been occurring for three weeks, and that he reported his symptoms to be getting "increasingly worse." *Id.* The medical chart indicates that

Martin requested "allergy medications" for his eyes. *Id.* Nurse Inglemon stated that they

consulted with Nurse Hughes, who ordered Claritin (an allergy medication) for Martin. *Id.*

On June 7 and 8, healthcare workers made chart entries indicating they had ordered

unspecified "labwork [sic]" for Martin, which Nurse Hughes wrote "did not reveal any

concerning abnormalities." *See* Dkt. 155-2 at 35.

On June 21, 2017, Martin requested that his "eye drops and allergy medication" be

"restarted" in accordance with a nurse's prior recommendation that he get new medication

because his other medication had "expired." Dkt. 155-1 at 10. Nurse Hughes renewed Martin's

"Nature's tears" medication the same day. Dkt. 162-2 at 32. On June 28, Martin was seen by

Nurse Tae Kim, who made a chart entry noting that Martin had "chronic dry itchy burning eyes"

and "redness to bilateral eyes." *Id.* Nurse Kim mentioned in their note that "[p]er [Nurse]

Hughes," a "provider app[ointment]" had been "scheduled for follow up." *Id.* The next day,

Martin sent a message to NaphCare indicating that Nurse Kim had told him "there would be a

change in eye drops/antihystamien [sic] to help with [his] eyes being so red/inflamed /dry and

extremely itchy and very very painful" and asked when those changes would take effect.

Dkt. 162-1 at 4. A NaphCare employee responded the same day and told him, consistent with

Nurse Kim's entry from the previous day, that he was scheduled to "see the [p]rovider

regarding" his eyes. *Id.*

On June 30, 2017, Nurse Hughes made a "SOAP note" indicating that she had seen

Martin regarding his eye complaints and performed an evaluation that included assessments of

his eye lids, lashes, lacrimal duct, sclera, limbus, pupils, and lens. Dkt. 162-2 at 31–32. Nurse

Hughes made a differential diagnosis that considered multiple possible conditions that may have

been responsible for Martin's symptoms, including "[i]ncreased intraocular pressure (ocular

hypertension)." *See id.* at 32. Nurse Hughes outlined plans to perform further tests on Martin to

"exclude systemic disease: "CBC, serum chemistry, urinalysis, ESR, and/or C-reactive protein."
*Id.* Martin was scheduled to see Dr. Balderrama a few days later.

On July 3, 2017, Martin was seen by Dr. Balderrama, who noted that Martin reported
"episodes of blurred vision" and "redness on both eyes" that had not improved with allergy
medication. *Id.* at 31. Dr. Balderrama observed that Martin had "mild erythema" in both eyes but
had "no other abnormal findings on retina." *Id.* Dr. Balderrama diagnosed Martin with
conjunctivitis and noted that it was unclear whether allergies played a role. *Id.* Dr. Balderrama
prescribed a "low dose" of prednisolone[1] and noted his plan to follow up with Martin in one
week for "re assessment [sic]." *Id.* One week later, Dr. Balderrama saw Martin for his follow up
appointment and noted that Martin reported "very little improvement with prednisolone," *id.* at
29, and concluded that he needed "a full ophthalmologic exam." *Id.*

On July 21, 2017—less than three weeks after the referral from Dr. Balderrama and about
two months after first reporting eye symptoms—Martin was seen by ophthalmologist Steven
Brady, DO, who noted that Martin complained of "redness, gritty sensation and burning" and
was "noticing halos around lights." Dkt. 155-4 at 41. Dr. Brady found during his examination
that Martin's intraocular pressures ("IOP") were abnormally high. Dkt. 158 at 4 (citing 155-4 at
41–43); *see* Dkt. 154 at 5. Dr. Brady diagnosed Martin with "bilateral ocular hypertension" and
"glaucoma suspect of both eyes." Dkt. 155-4 at 43. Dr. Brady prescribed two
medications—Latanoprost and Combigan—and instructed that Martin return to him for another
appointment in one to three weeks. *Id.* The same day of Martin's appointment, Nurse Hughes
made a chart entry indicating that she reviewed the record from the appointment, noted the

---

[1] Prednisolone is used to address inflammation and can "help relieve swelling, redness, itching,
and allergic reactions." Prednisolone (Oral Route), Mayo Clinic,
https://www.mayoclinic.org/drugs-supplements/prednisolone-oral-route/description/drg-
20075189. (last visited Feb. 22, 2024).

medications Martin was prescribed, and wrote that "[s]amples of medications [were] given."
Dkt. 162-2 at 29. Martin states in an interrogatory answer attached to his opposition brief that
"Defendants either lost or intentionally withheld the glaucoma medication samples provided by
Cascade Eye at my July 21, 2017 appointment." Dkt. 162-3 at 4–5. The medications were
ordered by NaphCare and arrived on July 23, 2017 and July 24, 2017, at which point NaphCare
employees began administering them to Martin. *See* Dkt. 155-2 at 13.

Martin returned to see Dr. Brady for his follow up appointment on August 22, 2017. Dkt.
155-4 at 38. Dr. Brady noted in his record of the visit that Martin stated he had been "compliant"
with the medications Dr. Brady had prescribed. *See id.* Dr. Brady indicated during his deposition
testimony that he meant by this "that the patient has the drops and [is] using the drops."
Dkt. 155-11 at 11. However, Dr. Brady found during his examination that Martin's IOP was still
elevated. Dkt. 155-4 at 39. He prescribed him "Diamox sequels," a glaucoma medication, and
indicated that Martin would need to have a drainage device called an "Ahmed Tube" surgically
placed in both eyes. *Id.* at 39. The next day, Dr. Balderrama made a chart entry noting Martin's
appointment with Dr. Brady, the new prescription for Diamox (which he indicated had already
been ordered), and Dr. Brady's instruction to schedule Martin for Ahmed Tube surgery.
Dkt. 155-2 at 32. Dr. Balderrama noted that he would "proceed with this intervention ASAP per
[Dr. Brady's] recommendation." *Id.*

On August 29, 2017, Dr. Brady prescribed Polymyxin and Prednisolone to be
administered four times a day prior to his surgeries. *See* Dkt. 162-2 at 26. Martin states in an
interrogatory answer that he "never received the drops four times a day as directed." Dkt. 162-3
at 5. However, in his opposition brief, Martin also cites to NaphCare's drug administration
records, which show certain days (including August 30, 2017, the first day that NaphCare began
administering the drug) on which fewer than four doses were noted and other days on which four

doses were administered. *See* Dkt. 162-2 at 13–26. Martin states in his interrogatory answer that these records are false. *See* Dkt. 162-3 at 10. Martin also states in one of his interrogatory answers that Dr. Brady instructed NaphCare to only administer the medications to his right eye, but that NaphCare employees administered them to both eyes. *Id.* at 5.

On September 14, 2017, Dr. Brady surgically implanted the first Ahmed Tube device in Martin's right eye. Dkt. 155-4 at 36–37. Nurse Hughes reviewed the records from the appointment the same day. Dkt. 155-2 at 31–32. Also on the same day, other NaphCare nurses called Dr. Brady's practice to clarify instructions for administering Martin's eye drops and were told that he "still need[ed] to use the g[l]aucoma drops in the other eye he did not have surgery on." *Id.* at 31. A record from Dr. Brady's practice dated September 18, 2017 stated that Martin was to receive Combigan and latanoprost in his left eye and Polymyxin and Prednisoloine in his right eye. Dkt. 155-4 at 33. However, Martin states in an interrogatory answer that:

> Immediately following the surgery to my right eye, Defendants not only discontinued the glaucoma drops Combigan and Latanprost to my right eye, but also my pre and post-operative medications Polymyxin B-Trimethoprim and Prednisolone Acetate. I did not begin receiving Polymyxin or Prednisolone in my right eye again until July 22, 2017, the day after the surgery to my left eye.

Dkt. 162-3 at 5.[2]

On September 21, 2017, the second Ahmed Tube was implanted in Martin's left eye. Dkt. 155-4 at 29. That day, Nurse Jessica Williams made a chart entry noting that a nurse had called from Dr. Brady's practice and stated that "the only drops that the patient should be taking is prednosolone acetate 1% and polymyxin b-trimethiopim X4 times daily in both eyes." Dkt. 155-2 at 31.

---

[2] Martin's interrogatory answer references July 2017, but the events he describes took place in September 2017.

The day after his second Ahmed Tube surgery, Martin returned to Dr. Brady for a follow up appointment. Dkt. 155-4 at 29–31. Dr. Brady noted that Martin was "doing well on the first post-operative day" and instructed that Martin wear an eye shield at "bedtime." *Id.* at 31. Martin states in an interrogatory answer that, later that same day, Nurse French tried to administer Combigan and Latanoprost despite Dr. Brady's instructions to discontinue them after the surgery. Dkt. 162-3 at 13–14. According to Martin, "[b]ecause [he] would not allow her to administer those drops against Dr. Brady's orders, Ms. French refused to administer prednisone and polymyxin as directed." *Id.* at 14.

Martin had additional appointments with Dr. Brady on September 26 and 29, and October 5 and 21. Dkt. 155 ¶ 4.[3] Martin also had numerous appointments with Dr. Balderrama for management and monitoring of his condition during this time. *See* Dkt. 155-2 at 26–30. During one of these appointments on November 7, 2017, Dr. Balderrama noted that Martin complained of "increasing pain" in his right eye and an "orange color on visual field since" his visit with him the week before. *Id.* at 26. Dr. Balderrama indicated in his notes that he informed "staff" that Martin needed to be seen "as soon as possible." *Id.* Martin saw Dr. Brady the next day and told him that he could only see a "blood/yellow tint" and was experiencing pain at "15/10 on [the] pain scale." Dkt 162-5 at 29. Dr. Brady examined Martin and found that his IOP had completely deflated. Dkt. 155-4 at 28. The same day, Nurse Hughes made a record noting her review of Martin's appointment records and stating that Martin was to return to Dr. Brady "ASAP" for a

---

[3] The background sections of Martin's opposition briefs cite observations and opinions of Dr. Michael Rausch—a doctor who treated Martin in September 2017, *see* Dkt. 162-2 at 6–8—including Dr. Rausch's conclusion that a "flare-up" Martin experienced in late September 2017 was "likely due to the delayed commencement of the post-surgery eye drops." Dkt. 160 at 7; Dkt. 158 at 7. However, the record evidence that Martin cites to does not contain these observations or opinions. *See id.* (citing Dkt. 162-5). Moreover, there do not appear to be any records on file that contain them.

viscoelastic injection to raise the pressure in his eye. Dkt. 155-2 at 25. Martin returned to

Dr. Brady the next day and was given the injection. *See id.* at 23, 28. Dr. Brady diagnosed Martin

with hypotony (low pressure in the eye), choroidal folds, and corneal edema of his right eye.

Dkt. 162-5 at 27. He discussed with Martin the potential need for "surgical interventions in the

future." *See id.* at 28. Nurse Hughes reviewed the records of this appointment the following day

and noted that Martin was to return to Dr. Brady in 1–5 days. *Id.* at 25. An unrebutted report

from Defendants' expert Dana Tannenbaum, M.D., opines that Martin's hypotony and vision

loss in November 2017 resulted from the advanced stage of his glaucoma at the time of diagnosis

and his Ahmed Tube surgeries. *See* Dkt. 155-5 at 4.

Martin returned to see Dr. Brady on November 14, 2017, and Dr. Brady noted that

Martin's hypotony, choroidal folds, and corneal edema were all improving. Dkt. 162-5 at 24. He

also noted that Martin "may need cell transplant on the backside of the cornea following healing"

and "[r]ecommend[ed]" that Martin have an appointment with cornea specialist Niraj Patel in 1–

6 weeks. *Id.* at 25. Nurse Hughes again made a record of Martin's appointment and noted the

potential need for the cell transplant and Dr. Brady's recommendation that he see Dr. Patel

within 1–6 weeks. Dkt. 162-2 at 28.

Martin saw Dr. Brady again on November 21, 2017, when Dr. Brady noted that his

hypotony, choroidal folds, and corneal edema were all continuing to improve and that Martin

was generally "doing well" at the exam. *See* Dkt. 162-5 at 22. Dr. Brady also noted that he was

considering a tube ligation procedure to increase Martin's IOP. *See id.* He again noted his

recommendation that Martin see Dr. Patel in 1–5 weeks and also noted that Martin was "to have

[a] consult" with Dr. Evelyn Fu, a retina specialist. *See id.* Dr. Balderrama made a record of the

appointment but did not note Dr. Brady's recommendations that Martin see Drs. Patel and Fu.

*See* Dkt. 162-2 at 12. However, during a follow up appointment on December 8, 2017, Dr. Brady

rescinded his recommendation for tube ligation and did not include a recommendation for consultations with Drs. Patel and Fu in his record for the appointment. *See* Dkt. 162-2 at 5. Martin then returned to Dr. Brady on December 13, 2017. Dkt. 162-5 at 17–19. Dr. Brady noted that Martin's IOP had improved that day. *Id.* at 19. However, Dr. Brady also stated that he "[s]trongly recommend[ed]" that Martin "keep his medications on his person as strict compliance is absolutely pertinent for [Martin's] chance of longterm [sic] success." *Id.* Dr. Brady also reinstated his recommendation for Martin to see Drs. Patel and Fu within 1–4 weeks. *See id.* Dr. Balderrama made a record of the appointment on the same day and noted Dr. Brady's recommendation for appointments with Drs. Patel and Fu. Dkt. 162-5 at 32–33.

A NaphCare record titled "Offsite Healthcare Authorization" and dated January 10, 2018, indicated that an upcoming appointment with Dr. Fu had to be cancelled because she was sick. *See* Dkt. 155-1 at 2. However, Martin saw a different retina specialist, Dr. Anthony Truxal, on January 12, 2018, around four weeks after Dr. Brady recommended that Martin see a retina specialist within 1–4 weeks. Dkt. 155-2 at 2; *see* Dkt. 162-5 at 19. Dr. Truxal concluded that Martin did not need additional treatment for his retina. *See* Dkt. 155-2 at 3. Dr. Balderrama made a record of the appointment that noted Dr. Truxal's recommendation. Dkt. 162-5 at 31.

On January 26, 2018, a NaphCare nurse informed Martin that an appointment with a cornea specialist was "in the pipeline." *See* Dkt. 162-5 at 31. On February 9, 2018, Martin returned to see Dr. Brady who noted that Martin was seeing "triple, three on top of each other." *Id.* at 11. Dr. Brady wrote in the appointment record that Martin's bilateral ocular hypertension was "[w]orsening," that his IOP was elevated on that day's exam, and that his glaucoma was at a "severe stage," despite also being "stable." *Id.* at 12–13. Dr. Brady again asked the jail to schedule a consultation with Dr. Patel, this time within two weeks. *Id.* at 13. The next day, Dr. Balderrama made a record discussing the appointment that did not note Dr. Brady's

recommendation for a consultation with a cornea specialist. *See id.* at 31. However, three days later, Dr. Balderrama told Martin during an examination related to "glaucoma headaches" that his evaluation with a cornea specialist was "pending," which he noted in the record he made for the visit. *Id.* at 30.

Martin saw a cornea specialist, Dr. Raghu Mudumbai, for the first time on February 27, 2018. Dkt. 155-6 at 2–5. He then saw another cornea specialist, Dr. Walter Rotkis, on March 21, 2018. Dkt. 155-7 at 2. Martin was released from jail in June 2018 and according to his amended complaint, "[a]fter his release, Mr. Martin underwent multiple eye surgeries including a failed partial cornea transplant, a full cornea transplant, and a second partial cornea transplant." Dkt. 19 ¶ 15. Martin's amended complaint summarizes the effects of his condition and Defendants' allegedly improper care as follows:

> The rapid deflation of Mr. Martin's right eye, resulting from Defendants' inadequate medical care, destroyed his cataract lens, leaving him only able to make out shadows and with severely damaged peripheral vision in that eye. The deflation of Mr. Martin's left eye permanently destroyed his peripheral vision, left it extremely sensitive to light, and with no depth perception.

*Id.* ¶ 54.[4]

Martin filed this case on July 20, 2020, Dkt. 1, and filed an amended complaint on December 17, 2020, Dkt. 19. He alleges claims for (1) denial of medical care in violation of the Eighth Amendment to the U.S. Constitution under 42 U.S.C. § 1983 against all Defendants; and (2) medical malpractice under RCW 7.70 against Dr. Balderrama, Nurse French, Nurse Hughes, Naphcare, and NaphCare Doe Employees 1–10 for the care they provided to Martin while he was incarcerated at PCDC. Dkt. 19 ¶¶ 56–78. On February 15, 2024, the Court granted, in part,

---

[4] The allegations in Martin's complaint are not competent evidence on summary judgment, *see Moran v. Selig*, 447 F.3d 748, 759 (9th Cir. 2006), and Martin's opposition does not cite evidence supporting all the allegations cited here. The Court only refers to these allegations to provide context for Martin's lawsuit.

Defendants' joint *Daubert* motion and excluded the standard of care and causation testimony of all of Martin's experts for both claims. *See generally* Dkt. 173.

Defendants, proceeding in two separate groups as "NaphCare Defendants" (Naphcare, Inc., Nurse Hughes, and Nurse French) and "Pierce County Defendants" (Dr. Balderrama, Pierce County, and unnamed Pierce County Doe Correction Officers 1–19), Dkt. 149 at 2, move for summary judgment for all claims asserted against them. Dkt. 149, 154. Martin also filed a motion for partial summary judgment seeking dismissal of Defendants' affirmative defenses. Dkt. 69. The motions are ripe for the Court's determination.

## II.    DISCUSSION

### A.    Jurisdiction

The Court has "original jurisdiction over Martin's § 1983 claim under 28 U.S.C. § 1331 and 28 U.S.C. § 1343, and supplemental jurisdiction over his state medical malpractice claim under 28 U.S.C. § 1367(a)." *Martin v. Pierce Cnty.*, 34 F.4th 1125, 1128 (9th Cir. 2022).

### B.    Legal Standards

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party may fulfill its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), or by producing "evidence negating an essential element of the nonmoving party's claim." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). To carry their ultimate burden of

persuasion, the movant "must persuade the court that there is no genuine issue of material fact." *Id.* If the moving party meets its initial burden of production, the non-moving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. To do so, they must present "some 'significant probative evidence tending to support the complaint.'" *Gen. Bus. Sys. v. N. Am. Philips Corp.*, 699 F.2d 965, 971 (9th Cir. 1983) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof at trial. *Celotex*, 477 U.S. at 323.

The evidence relied upon by the nonmoving party must be able to be "presented in a form that would be admissible in evidence." *See* Fed. R. Civ. P. 56(c)(2). Interrogatory answers and depositions that "identify the deponent and the action and include[s] the court reporter's certification" are competent evidence on summary judgment. *D.T. v. NECA/IBEW Fam. Med. Care Plan*, No. 2:17-cv-00004-RAJ, 2019 WL 6894508, at *2 n.2 (W.D. Wash. Dec. 18, 2019) (citing *Orr. v. Bank of Am., NT & SA*, 285 F.3d 764, 774 (9th Cir. 2002)); *see* Fed. R. Civ. P. 56(c)(1)(A) (including "depositions" and "interrogatory answers" as forms of evidence that may be cited to in support of or opposition to summary judgment). Because the evidence must be capable of presentation at trial, statements in these materials must be supported by the personal knowledge of the declarant. Fed. R. Evid. 602; Fed. R. Evid. 802; *see also Nigro v. Sears, Roebuck and Co.*, 784 F.3d 495, 497 (9th Cir. 2015) (holding that a "self-serving declaration that states only conclusions and not facts that would be admissible evidence" is insufficient to create a genuine factual dispute); *Muzyka v. Rash Curtis & Assocs.*, No. 2:18-cv-01097 WBS, 2019 WL 2869114, at *2 (E.D. Cal. July 3, 2019) ("Federal Rule of Civil Procedure 56(c) explicitly permits district courts to consider 'answers to interrogatories when reviewing a motion for

summary judgment so long as the content of those interrogatories would be admissible at trial.'")
(quoting *Johnson v. Holder*, 700 F.3d 979, 982 (7th Cir. 2012)).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Consequently, in ruling on a motion for summary judgment, "a District Court must resolve any factual issues of controversy in favor of the non-moving party . . . ." *Lujan,* 497 U.S. at 888 (internal quotations omitted). But conclusory, nonspecific statements in affidavits are not sufficient, and "missing facts" will not be presumed. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990). "The Court will not infer evidence that does not exist in the record." *Crouthamel v. Walla Walla Public Schools*, 535 F. Supp. 3d 1025, 1033 (E.D. Wash. 2021) (citing *Lujan*, 497 U.S. at 888–89).

**C.      Analysis**

*1.      Unnamed Doe Defendants*

Both sets of Defendants argue that the unnamed "NaphCare Doe Employees" and "Pierce County Doe Correction Officers" must be dismissed because claims against unnamed "Doe" defendants are not proper at this stage of the litigation. Dkt. 154 at 27–28; Dkt. 149 at 3. When a plaintiff names "John Doe" defendants in a lawsuit, they "should be given an opportunity through discovery to identify the unknown defendants, unless it is clear that discovery would not uncover the identities, or that the complaint would be dismissed on other grounds." *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980). Summary judgment is proper if unnamed defendants are not identified by the completion of discovery. *Reed v. Cox*, 821 F. App'x 836, 837 (9th Cir. 2020) ("The district court properly granted summary judgment on Reed's destruction of property claim because Reed failed to identify the John Doe defendant after the completion of nearly two years of discovery."). Initial disclosures in this case were due on November 4, 2020, Dkt. 7, and

the discovery cutoff was January 6, 2023. Dkt. 42. Martin did not identify the unnamed Doe

Defendants by the end of discovery. Accordingly, summary judgment is granted as to Martin's

claims against the unnamed Pierce County and NaphCare John Doe Defendants.

2.     *Medical Malpractice*[5]

In its previous ruling on Defendants' *Daubert* motion, the Court excluded Dr. Brady's

standard of care testimony under Federal Rule of Evidence 601 and his causation testimony

under Rule 702. Dkt. 173 at 18–21, 25–28. Both are "necessary elements" of a Washington

medical malpractice claim. RCW 7.70.040(1). Martin relies in part on Dr. Brady's testimony to

establish the standard of care for his corporate negligence claim, *see* Dkt. 158 at 19–22, and he

relies on it entirely to establish his malpractice claim against Dr. Balderrama, *see* Dkt. 160 at 20–

21. The Court considers each claim in turn.

a.   *Medical Malpractice Claim Against Dr. Balderrama*

Martin brings a medical malpractice claim against Dr. Balderrama for his alleged "failure

to timely facilitate consults with specialist[s] and properly enter clinically relevant information."

Dkt. 160 at 20.

To prove a Washington state medical malpractice claim, the plaintiff must show that:

(a) the health care provider failed to exercise that degree of care, skill, and learning
expected of a reasonably prudent health care provider at that time in the profession or
class to which he or she belongs, in the state of Washington, acting in the same or similar
circumstances, and (b) such failure was a proximate cause of the injury complained of.

---

[5] In his opposition to NaphCare Defendants' motion for summary judgment, Martin abandons his
Washington medical malpractice claims against Nurses French and Hughes. Dkt. 158 at 19.
Summary judgment is granted as to those claims.

RCW 7.70.040(1). Expert testimony is generally required to prove both elements. *Berger v. Sonneland*, 144 Wn.2d 91, 110–11, 26 P.3d 257 (2001).[6]

The only expert testimony Martin provides in support of the claim is the testimony of Dr. Brady. *See id.* at 21–22. The Court has excluded this evidence because it does not meet the standards for admissibility. Dkt. 173 at 18–21, 25–28. Moreover, the portions of Dr. Brady's testimony that Martin cites in his discussion of his malpractice claim against Dr. Balderrama are not in the factual record. *See* Dkt. 160 at 21–22.[7] The Court cannot consider evidence not in the record on summary judgment. *See* Fed. R. Civ. P. 56(c)(1)(A) (parties may oppose summary judgment by "citing to particular parts of materials *in the record*." (emphasis added)); *Crouthamel*, 535 F. Supp. 3d at 1033. Accordingly, the Court grants summary judgment to Dr. Balderrama on Martin's malpractice claim given Martin's failure to produce competent evidence in support of it.

In addition, even if the Court were to consider the evidence Martin cites to support his claim, it would not suffice to avoid summary judgment. Dr. Brady supposedly testified at his deposition that "requesting that [Martin] receive[] a consultation took a long time. And so to me that was an indication of, okay, so maybe there's an issue with the system here where, like,

---

[6] Expert testimony to establish the standard of care for a medical malpractice claim is not required when "the practice of a professional is such a gross deviation from ordinary care that a lay person could easily recognize it." *See Petersen v. State*, 100 Wn.2d 421, 437, 671 P.2d 230 (1983); *Douglas*, 117 Wn.2d at 249. However, Martin has not argued that this is such a case, and instead suggests that his expert, Dr. Brady, has provided standard of care testimony for his malpractice claims. See Dkt. 160 at 20 ("Dr. Steven Brady is more than qualified to opine on the standard of care for medical doctors in family practice.").

[7] These portions of Dr. Brady's testimony—which are also cited in support of Martin's corporate negligence claim against NaphCare, *see* Dkt. 158 at 20–21—cite to exhibit eight of Martin's counsel's declaration filed in support of Martin's opposition to Defendants' motions for summary judgment. *Id.* at 20–21 n.54–58. Neither this exhibit, nor any other exhibits in the record, contain the excerpts cited in Martin's opposition brief.

somebody is not getting these notes" and that he "figured . . . somehow [Martin's] coordination of care wasn't what it would be if he were not incarcerated." Dkt. 158 at 20–21.  While Dr. Brady's statements express concern about the jail's system for coordinating outside appointments, they do not speak specifically to causation.[8]  Accordingly, even if this evidence was in the record, it would not be sufficient to avoid summary judgment.

Because Martin has not put forth competent evidence for either essential element of his medical malpractice claim, and because his evidence would not suffice even if it were competent, Dr. Balderrama is entitled to summary judgment.

### b.   Corporate Negligence Claim Against NaphCare

The doctrine of corporate negligence "is based on a nondelegable duty that a hospital owes directly to its patients." *Douglas v. Freeman*, 117 Wn.2d 242, 248, 814 P.2d 1160 (1991). Corporate negligence

> does not impose vicarious liability on a hospital for the acts of a medical staff member. The pertinent inquiry is whether the hospital exercised reasonable care in the granting, renewal, and delineation of staff privileges. This inquiry focuses on the procedures for the granting and renewal of staff privileges set forth in the hospital bylaws.

*Pedroza v. Bryant*, 101 Wn.2d 226, 235, 677 P.2d 166 (1984). The Washington Supreme Court has also recognized the following as duties owed by a hospital to its patients relevant to a corporate negligence claim:

> (1) to use reasonable care in the maintenance of buildings and grounds for the protection of the hospital's invitees; (2) to furnish the patient supplies and equipment free of defects; (3) to select its employees with reasonable care; and (4) to supervise all persons who practice medicine within its walls.

---

[8] Martin's brief does not address causation at all, aside from his conclusory statement that "Dr. Balderrama failed to provide adequate healthcare to Mr. Martin which caused harm to his condition." Dkt. 160 at 23.

1    *Douglas*, 117 Wn.2d at 248. To succeed on a corporate negligence claim, the plaintiff must show

2    "a duty of care owed to plaintiff by the clinic, a breach of that duty, and proximate cause

3    between the breach and plaintiff's injury." *Id.*

4         Martin argues that NaphCare is liable under the doctrine of corporate negligence because

5    NaphCare's employees' failure to comply with Dr. Brady's treatment plan indicated there "was a

6    systemic problem with the jail medicine delivery system," Dkt. 158 at 21, and its failure to

7    timely schedule outside medical appointments and its "inaccurate medical record keeping" were

8    "also indicative of Naphcare failing to comply with its stated policies." *Id.*

9         To establish the standard of care, Martin relies on the testimony of Dr. Brady and certain

10   NaphCare "policies," which appear in a "proposal of services" that NaphCare presented to

11   PCDC. Dkt. 162-6 at 3. As to Dr. Brady, the Court has already excluded his standard of care

12   testimony. *See* Dkt. 173 at 18–21. Moreover, the testimony of Dr. Brady that Martin cites in his

13   discussion of corporate negligence—which is the same as that cited in support of the malpractice

14   claim against Dr. Balderrama—is not in the factual record.

15        As to NaphCare's policies, Martin cites one in which NaphCare commits that it "will

16   assure there is adequate licensed staff to conduct medication passes frequently enough that

17   inmates receive their medications in a timely fashion as prescribed." Dkt. 162-6 at 5. The

18   policies are contained in a "proposal of [NaphCare's] services" sent to PCDC by NaphCare on

19   December 18, 2015. *Id.* at 3. As explained in the Court's *Daubert* Order (Dkt. 173), the standard

20   of care for hospitals or other corporate medical care providers may be defined either by "the

21   accreditation standards of the Joint Commission on Accreditation of Hospitals and the hospital's

22   own bylaws" or by statute. *Douglas v. Freeman*, 117 Wn.2d 242, 248, 814 P.2d 1160 (Wash.

23   1991).

24

But Martin does not establish that the policies in NaphCare's contract proposal are the equivalent of a bylaw that can establish the standard of care. *See Pedroza v. Bryant*, 101 Wn.2d 226, 234, 677 P.2d 166 (Wash. 1984) (noting that bylaws are relevant to the standard of care because "[h]ospitals are required by statute and regulation to adopt bylaws with respect to medical staff activities" and "[i]t is 'recommended' that the organization and functions of the medical staff under the bylaws be in accord with the [Joint Commission on Accreditation of Hospitals] standards. Bylaws are therefore based on *national standards*, and their use in defining a standard of care for hospitals is appropriate." (citations omitted) (emphasis added)). What Martin cites as NaphCare's policies appear to be contractual commitments, not bylaws that are tied to national standards. Accordingly, this evidence also does not establish the standard of care for Martin's corporate negligence claim against NaphCare.

Moreover, even if Martin was able to establish the standard of care and NaphCare's breach of it, his claim would fail because he has not provided competent evidence to show that NaphCare's conduct was the proximate cause of Martin's injuries. The Court has already excluded Dr. Brady's causation testimony for failure to meet the relevance standard of Federal Rule of Evidence 702 because Dr. Brady did not testify that NaphCare employees' alleged failure to follow his treatment plan *probably* or *more likely than not* caused Martin's asserted injuries. Dkt. 173 at 25–28. And the specific deposition testimony that Martin cites, which also fails to draw a sufficient causal connection between NaphCare's conduct and Martin's injuries, is not in the factual record and therefore cannot be considered. *See* Fed. R. Civ. P. 56(c)(1)(A); *Crouthamel*, 535 F. Supp. 3d at 1033.

Finally, Martin argues that NaphCare's "failure to timely schedule and approve outside medical appointments with cornea and retina specialists" and "inaccurate medical record keeping" also constituted medical malpractice. *See* Dkt. 158 at 21. To establish the standard of

care, Martin cites to other "policies" from NaphCare's proposal of services to PCDC that state that "[o]n average, NaphCare's . . . nurses review off-site requests in less than one day" and that NaphCare "closely monitors inmates diagnosed with chronic and complex illness." Dkt. 162-6 at 7–8. As explained above, the contract proposal does not establish the standard of care for Martin's corporate negligence claim. And even if it did, Martin has not provided any causation testimony showing that either NaphCare's alleged failure to "timely schedule and approve outside medical appointments" or its "inaccurate medical record keeping" caused his deteriorating condition. The only cited testimony pertaining to these portions of Martin's claim is Dr. Brady's observation that "requesting that [Martin] receive[] a consultation took a long time. And so to me that was an indication of, okay, so maybe there's an issue with the system here where, like, somebody is not getting these notes" and his statement that he "figured . . . somehow [Martin's] coordination of care wasn't what it would be if he were not incarcerated." Dkt. 158 at 20–21. This testimony is not competent evidence because it is not in the record, and it does not opine that NaphCare's delay in setting up a consultation or poor record-keeping caused a particular outcome with respect to Martin's condition.

As with standard of care testimony, causation must be proven with specificity. *See Rathod v. United States*, No. 22-36045, 2023 WL 8710550, at *1 (9th Cir. Dec. 18, 2023) ("Summary judgment is appropriate where a plaintiff's expert fails to identify specific facts in support of a causation analysis.") (citing *Guile v. Ballard Cmty. Hosp.*, 70 Wash. App. 18, 25, 851 P.2d 689 (1993)). The Court may not infer causation where it is not reasonably supported by the evidence provided under the "governing substantive law." *See T.W. Elec. Serv., Inc.*, 809 F.2d at 631; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Without competent evidence from Martin establishing the standard of care or causation, NaphCare is entitled to summary judgment on Martin's corporate negligence claim.

1

2       3.      *Deliberate Indifference*

3       "Under 42 U.S.C. § 1983, to maintain an Eighth Amendment claim based on prison

4       medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" *Jett*

5       *v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104

6       (1976)). The Ninth Circuit uses a two-pronged test to assess deliberate indifference claims:

> First, the plaintiff must show a serious medical need by demonstrating that failure
> to treat a prisoner's condition could result in further significant injury or the
> unnecessary and wanton infliction of pain. Second, the plaintiff must show the
> defendant's response to the need was deliberately indifferent.

*Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012). Plaintiffs must show two elements to

establish the second prong: "(a) a purposeful act or failure to respond to a prisoner's pain or

possible medical need and (b) harm caused by the indifference." *Id.*

The state-of-mind requirement for deliberate indifference is subjective and requires a

plaintiff to show that the defendant knew of and disregarded "an excessive risk to inmate health

or safety; the official must both be aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he must also draw the inference." *Ford v. Ramirez-*

*Palmer (Estate of Ford)*, 301 F.3d 1043, 1050 (9th Cir. 2002) (quoting *Farmer v. Brennan*, 511

U.S. 825, 834 (1994)); *see Gordon v. County of Orange*, 888 F.3d 1118, 1125 n.4 (9th Cir. 2018)

(noting that the Eighth Amendment requires that "the prison official must *subjectively* have a

sufficiently culpable state of mind" (internal quotations omitted)). "Neither negligence nor gross

negligence will constitute deliberate indifference." *Clement v. Cal. Dep't of Corr.*, 220 F. Supp.

2d 1098, 1105 (N.D. Cal. 2002) (first citing *Farmer*, 511 U.S. at 835–36 & n.4; then citing

*Estelle*, 429 U.S. at 106). "Whether [an] official had the requisite knowledge of a substantial risk

is a question of fact subject to demonstration in the usual ways, including inference from

circumstantial evidence." *Farmer*, 511 U.S. at 842. Individual or "isolated" instances of neglect

of a prisoner's medical condition is usually insufficient to show deliberate indifference; however, a finding that "the defendant repeatedly failed to treat an inmate properly or that a single failure was egregious strongly suggests that the defendant's actions were motivated by 'deliberate indifference' to the prisoner's medical needs." *McGuckin v. Smith*, 974 F.2d 1050, 1060–61 (9th Cir. 1992).

### a. Dr. Balderrama

"A person deprives another of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which the plaintiff complains. The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988) (cleaned up) (citing *Rizzo v. Goode,* 423 U.S. 362, 370–71, 375–77 (1976)). "The deliberate indifference standard requires proving some degree of individual culpability, but does not require proof of an express intent to punish." *Id.* at 633. When a plaintiff "seek[s] to hold an individual defendant personally liable for damages, the causation inquiry between the deliberate indifference and the eighth amendment deprivation" is especially "refined." *Id.* "There must be an affirmative link between a defendant's actions and the claimed deprivation." *Roberts v. Shepard*, No. EDCV 16-1697 CJC(JC), 2018 WL 6265090, at *5 (C.D. Cal. Feb. 12, 2018) (citing *Rizzo*, 423 U.S. at 362); *see McGuckin v. Smith*, 974 F.2d 1050, 1062 (9th Cir. 1992) (individual doctors who treated the plaintiff were not liable for deliberate indifference where there was insufficient evidence that they personally, as opposed to other prison officials, were responsible or at fault for delays in treatment that harmed the plaintiff), *overruled on other grounds*, *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997).

Martin argues that Dr. Balderrama was deliberately indifferent to his medical needs because he repeatedly failed to "note" Dr. Brady's instructions to schedule outside consultations with specialists. *See* Dkt. 160 at 18–19. According to Martin, on one occasion, Dr. Balderrama "failed to facilitate scheduling either appointment." *See id.* at 18. However, Martin points to no evidence indicating that any of these alleged failures caused him harm. Martin must produce causation evidence specific to each individual defendant. *Leer*, 844 F.2d at 633; *see also Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985) ("[M]ere delay of surgery, without more, is insufficient to state a claim of deliberate medical indifference.") (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976))).

The U.S. District Court for the District of Arizona's decision in *Beitman v. Correct Care Solutions*, No. CV17-08229-PCT-JAT, 2021 WL 7257723 (D. Ariz. Oct. 26, 2021), is instructive regarding the degree of specificity that is sufficient to avoid summary judgment for a deliberate indifference claim. In declining to reconsider its order denying summary judgment, the Court noted that the following evidence was sufficient for the plaintiff to show a genuine dispute of material fact:

> Here, regardless of whether expert testimony would be necessary to opine as to causation, Beitman can testify that during the period when his free testosterone measured as low and "Below Lower Panic Levels" and NP Hahn did not adjust his treatment, he suffered muscle cramping, back and body pain, fatigue, weight loss, and testicle atrophy and that when he finally received an increase in his testosterone dosage, these symptoms abated or disappeared. This testimony would be sufficient for a jury to infer that a failure to treat Beitman's low testosterone and increase his medication dosage caused Beitman's symptoms.

*Beitman*, 2021 WL 7257723, at *3. *Beitman* provides an example of evidence that is sufficiently specific and individualized to create a genuine issue of fact regarding causation; here, Martin does not address causation aside from making the conclusory argument, without citation to the record, that Dr. Balderrama's conduct "caused Mr. Martin to suffer unnecessary excruciating

1    pain." Dkt. 160 at 19; *see Spencer v. Sharp*, 2011 U.S. Dist. LEXIS 163246, at *33 (D. Ariz.

2    Mar. 30, 2011) ("Plaintiff does not demonstrate that any delay in obtaining surgery led to further

3    harm. *He sets forth only conclusory and general claims that he suffered damage and blindness*.

4    But Plaintiff proffers *no evidence or expert opinion* showing that any delay in surgery or

5    treatment *caused* harm, and a review of the medical records—in particular, the specialists'

6    reports—provides nothing from which an inference could be made that delays caused Plaintiff to

7    suffer further harm." (emphasis added) (internal citations omitted)). Without specific,

8    individualized causation evidence, a reasonable juror could not find that Dr. Balderrama's

9    conduct—as opposed to some other cause, such as one of the alternatives identified by Dr. Brady

10   or the Defendants' expert—caused or contributed to Martin's poor outcomes. Dr. Balderrama is

11   entitled to summary judgment on Martin's deliberate indifference claim.

12          b.  *Nurse French*[9]

13          Martin's deliberate indifference claim against Nurse French suffers from the same

14   problem as his claim against Dr. Balderrama. Martin's evidence cited in support of this claim is

15   his answer to an interrogatory about Nurse French's treatment:

16          Ms. French repeatedly withheld and/or failed to properly administer my medications, and
17          failed to keep accurate and compete medical records which contributed to the rapid
             deterioration of my eyes. As addressed above, jail medical staff never woke me up in the
18          early morning to administer medication. Ms. French inaccurately noted administering
             Prednisone and Polymyxin on the following dates and as a result prevented me from
19          receiving the medications as directed, and preventing other jail medical staff from
             discovering I did not receive the medications as directed: October 4, 2017 at 1:39 a.m.;
20          September 28, 2017 at 2:20 a.m.; September 22, 2017 at 1:56 a.m.; September 20, 2017
             at 1:24 a.m.; September 6, 2017 at 1:55 a.m. On September 22, 2017, Ms. French also
21          attempted to administer my glaucoma medicines Combigan and Latanoprost to both of
             my eyes despite Dr. Brady's post-operative instructions to discontinue use after surgery.
22          Because I would not allow her to administer those drops against Dr. Brady's orders,

23   ---
     [9] Martin's opposition brief does not address NaphCare Defendants' request for summary
     judgment on his official capacity claim against Nurses Hughes and French. *See* Dkt. 154 at 18–
24   19; *see generally* Dkt. 158. Accordingly, summary judgment is granted as to these portions of
     Martin's deliberate indifference claim.

ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT - 23

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

> Ms. French refused to administer prednisone and polymyxin as directed to help my eyes recover after my surgeries."

Dkt. 162-3 at 13–14. Martin again does not address causation at all, *see* Dkt. 158 at 15–16, let alone provide specific, individualized evidence that Nurse French's conduct caused a particular injury or harm. *See Leer*, 844 F.2d at 633; *cf. Beitman*, 2021 WL 7257723, at *3. That Martin points in the background section of his brief to symptoms he was experiencing around the time of Nurse French's alleged deliberate indifference does not suffice; Martin was suffering from severe complications of his condition, and he does not provide any evidence showing that Nurse French's failure to correctly administer eyedrops is what caused the symptoms. Without *specific* evidence establishing causation, a reasonable juror could not conclude that it was Nurse French—as opposed to Martin's underlying advanced disease—that caused him harm.

### c.  Nurse Hughes

Martin argues that Nurse Hughes was deliberately indifferent to his serious medical condition because she allegedly "waited well over a month after becoming aware of Mr. Martin's eye condition before conducting an examination, despite Mr. Martin's persistent complaints of eye pain irritation"; made Martin wait three days before starting his glaucoma medication after sample glaucoma drops were provided to NaphCare in July 2017; "failed to provide instructions that Mr. Martin's pr-operative [sic] drops should only be administered to his right eye" on August 29, 2017; and "failed to schedule a consult with a cornea specialist, after requested by Dr. Brady [sic]," on November 10, 2017. Dkt. 158 at 16.

Martin again does not provide specific evidence that any of the alleged conduct he identifies caused him harm. *See Spencer v. Sharp*, 2011 U.S. Dist. LEXIS 163246, at *34 (D. Ariz. Mar. 30, 2011) (granting summary judgment where there was no "competent evidence" to

show that a prison doctor's alleged failure to schedule outside consults to see an ophthalmologist or retinal specialist "resulted in any harm to" the plaintiff).

Moreover, the undisputed evidence shows that, during the month between Martin's first eye-related complaints and his first physical examination, Nurse Hughes participated in Martin's care by reviewing his lab work and consulting with other nurses regarding Martin's medication, Dkt. 155-2 at 32–33. Martin also had appointments with other nurses during this time. *See id.* At first—consistent with his own reports—NaphCare's nurses were treating Martin's eye problems as being caused by allergies. *See supra* Section I. Even if this was mistaken, neither "negligent misdiagnosis" nor a difference in medical opinion is sufficient to show deliberate indifference. *See Wilhelm*, 680 F.3d at 1123; *see also Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) ("[A] plaintiff's showing of nothing more than a difference of medical opinion as to the need to pursue one course of treatment over another [is] insufficient, as a matter of law, to establish deliberate indifference."). Given Nurse Hughes' diligence in treating and attending to Martin during this time period, no reasonable juror could find that her failure to more quickly diagnose Martin was something greater than negligence.[10] Thus, even if the Court assumes that Nurse Hughes was at least partially responsible for NaphCare's failure to diagnose Martin with glaucoma when he first began to report symptoms, this is not sufficient on its own to sustain a deliberate indifference claim against her.[11]

---

[10] Martin also has not provided any evidence showing that Nurse Hughes' and other NaphCare employees' initial diagnoses were improper, or that it was unreasonable to consider whether less serious conditions were causing his symptoms before referring Martin to Dr. Balderrama and outside specialists.

[11] Martin cites his interrogatory answer as evidence for the three-day delay in administering his glaucoma medicine, in which he states that the delay was attributable to "Defendants" either losing or "intentionally with[holding]" the samples. Dkt. 163-3 at 4–5. However, even if the Court were to consider this explanation, which Martin does not provide in his opposition brief,

1

2

3

Finally, with respect to Martin's assertion that Nurse Hughes failed to note Dr. Brady's instruction to only administer medications to Martin's right eye, Martin does not present evidence that Nurse Hughes was responsible for documenting Dr. Brady's instructions such that her failure caused the incorrect administration of Martin's medications. *See McGuckin*, 974 F.2d at 1062 (9th Cir. 1992) (individual doctors who treated the plaintiff were not liable for deliberate indifference where there was insufficient evidence that they personally, as opposed to other prison officials, were responsible or at fault for delays in treatment that harmed the plaintiff). Nor does Martin explain how her failure to make these notes constituted more than "negligence" or "mere inadvertence." *See Farmer*, 511 U.S. at 860. Nurse Hughes is entitled to summary judgment on Martin's deliberate indifference claim.

> ### d.   NaphCare and Pierce County[12]

To bring a *Monell* claim against a municipality, the plaintiff must establish "the local government had a deliberate policy, custom, or practice that was the 'moving force' behind the constitutional violation [he] suffered." *Whitaker v. Garcetti*, 486 F.3d 572, 581 (9th Cir. 2007) (citing *Monell*, 436 U.S. at 694).[13] However, the Court need not reach the *Monell* analysis,

---

this evidence cannot create a genuine question of material fact because Martin has not established personal knowledge of the reasoning behind the delay. *See* Fed. R. Civ. P. 56(c)(2) (requiring that evidence in support of or opposition to motions for summary judgment be capable of presentation in "a form that would be admissible in evidence"); Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

[12] Martin's claim as to Pierce County incorporates his allegations and arguments against NaphCare, as his opposition to Pierce County Defendants' motion for summary judgment argues only that the County should be held liable for NaphCare's constitutional violations. *See* Dkt. 160 at 16–17. Accordingly, the Court considers claims against both entities in this section.

[13] NaphCare Defendants concede that a *Monell* claim may be brought against it as a private entity "acting under color of state law." *See* Dkt. 154 at 26 (quoting *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012)).

as Martin's failure to present evidence of causation applies to these claims as well. *See Williams v. County of Los Angeles*, 695 F. App'x 192, 193 (9th Cir. 2017) ("Plaintiffs' Fourteenth Amendment and *Monell* claims are dependent on the above Eighth Amendment claim and, therefore, likewise fail."). Martin argues that NaphCare practices or policies were responsible for "delayed and denied needed consultations with specialists and recommended cornea surgery." Dkt. 158 at 17. As to causation, Martin once again states in conclusory fashion, and without citation, that "[t]hose delays resulted in Mr. Martin unnecessarily suffering excruciating pain." *Id.* at 18. As previously explained, this is insufficient to survive summary judgment both because of the failure to cite specific evidence in the record and the overall lack of evidence establishing that these delays caused Martin harm. Summary judgment is granted in favor of NaphCare and Pierce County on Martin's *Monell* claims.

    4.    *Plaintiff's Motion for Partial Summary Judgment*

Martin's motion for partial summary judgment seeks summary judgment for all of Defendants' remaining affirmative defenses. Dkt. 69. Because the Court is granting summary judgment to Defendants on all of Martin's underlying claims, the Court DENIES the motion for partial summary judgment as MOOT.

### III.    CONCLUSION

For the foregoing reasons, Pierce County and NaphCare Defendants motions for summary judgment are GRANTED. Dkt. 149, 154. Plaintiff Jeffery S. Martin's motion for partial summary judgment is DENIED as MOOT.

Dated this 26th day of February, 2024.

Tiffany M. Cartwright
United States District Judge